UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RANDALL W. RUEBEL, MARIO HUDSON, and
TAMMY L. JOHNSON, individually, and as repre-
sentatives of a Class of Participants and Beneficiaries
of the Tyson Foods, Inc. Retirement Savings Plan,

                  Plaintiffs,

                  v.

TYSON FOODS, INC.

                  and

BOARD OF DIRECTORS OF TYSON FOODS, INC.,

                  Defendants.

Civil Action No. 5:23-cv-05216-TLB

CLASS ACTION
COMPLAINT PURSUANT
TO 29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiffs, Randall W. Ruebel, Mario Hudson, and Tammy L. Johnson ("Plaintiffs"),

individually and as representative of a Class of Participants and Beneficiaries of the Tyson Foods, Inc.

Retirement Savings Plan (the "Plan" or "Tyson Foods Plan"), by their counsel, WALCHESKE &

LUZI, LLC, and CARNEY BATES & PULLIAM, PLLC as and for a claim against Defendants, alleges

and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable

under the circumstances, the following:

## INTRODUCTION

1.      As the Eighth Circuit has observed, "ERISA's fiduciary duties. . . have been described

as the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

2.      Defendants, Tyson Foods Inc. ("Tyson Foods") and the Board of Directors of Tyson

Foods Inc. ("Board"), are fiduciaries under the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 401(k)

defined contribution retirement plan – known as the Tyson Foods, Inc. Retirement Savings Plan (the "Plan" or "Tyson Foods Plan") – that it sponsors and provides to its employees.

3.    During the putative Class Period (November 30, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739-740 (2022), and by failing to remove their high-cost recordkeeper, Northwest Plan Services, Inc. ("Northwest").[1]

4.    Plaintiffs are "participants" of the Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

5.    The Plan is a Section 401(k) "defined contribution" retirement plan under 29 U.S.C. § 1002(34), meaning that Tyson Food's contributions to the payment of Plan costs is guaranteed but the retirement benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) (emphasis added.)

6.    Tyson Foods and its Board are both the Plan Sponsor and Plan Administrator of the Plan.

7.    Plaintiffs allege two ERISA violations against Defendants: a violation of the duty of prudence against Defendants under 29 U.S.C. § 1104(a)(1)(B) for charging Plan participants excessive Total RKA fees, and a claim against Defendants for failure to monitor fiduciaries responsible for Plan administration with regard to Plan Total RKA fees.

8.    More specifically, Count I alleges a breach of the fiduciary duty of prudence by De-fendants for incurring unreasonable Total RKA fees. Among other things, Defendants *paid over a 75%*

_____

[1] Based on Form 5500s dating back to 2009, Northwest has been the recordkeeper of the Plan for at least fifteen years.

*premium* per-participant for Total RKA fees for the Plan to the Plan recordkeeper, Northwest, during the Class Period.

9.      Defendants should have lowered its Total RKA fees by soliciting bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so, or did so ineffectively, during the Class Period.

10.     Counts II alleges a breach of fiduciary duty by Defendants for failing to monitor those individuals responsible for paying these unreasonable Total RKA fees.

11.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

12.     The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529. This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control).

13.     Plan fiduciaries have a continuing duty to monitor their RKA fees to make sure that they are not excessive with respect to the services received.

14.     Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees

and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Hughes II*, 63 F.4th at 625-626.

15.    ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

16.    There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." *See Braden*, 588 F.3d at 602.

17.    The unreasonable Total RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services, given their level and quality, were improvident.  The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

18.    There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.* at 635.  Defendants' fiduciary decisions fall outside the range of reasonableness.  *Id.* at 630, 633.

19.    These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

20.    To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §

1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought

under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

22.    This Court has personal jurisdiction over Defendants because they transact business

in this District, reside in this District, and have significant contacts with this District, and because

ERISA provides for nationwide service of process.

23.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) be-

cause some or all of the violations of ERISA occurred in this District and Defendants reside and may

be found in this District.

24.    In conformity with 29 U.S.C. §1132(h), Plaintiffs served this Complaint by certified

mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

25.    Plaintiff, Randall W. Ruebel, is a resident of the State of Oklahoma and currently

resides in Enid, Oklahoma, and during the Class Period, he was a participant in the Plan under ERISA

§ 3(7), 29 U.S.C. § 1002(7).

26.    Plaintiff Ruebel held numerous positions, including material handler and second-shift

warehouse lead, at the Tyson Foods location at the Enterprise Plant in Enid, Oklahoma, and has been

employed by Tyson Foods from March 2016 through present.

27.    During the Class Period, Plaintiff Ruebel invested in the Age 41-45 Asset Allocation

Portfolio and the Age 46-50 Asset Allocation Portfolio. Plaintiff Ruebel is still currently enrolled in

the Plan.

28.     Plaintiff, Mario Hudson, is a resident of the State of Arkansas and currently resides in Pine Bluff, Arkansas, and during the Class Period, he was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

29.     Plaintiff Hudson is a shift lead in the warehouse at the Tyson Foods location in Pine Bluff, Arkansas, and has been employed by Tyson Foods from August 10, 1998 through present.

30.     During the Class Period, Plaintiff Hudson invested in the Age 36-40 Asset Allocation Portfolio. Plaintiff Hudson is still currently enrolled in the Plan.

31.     Plaintiff, Tammy L. Johnson, is a resident of the State of Mississippi and currently resides in Walnut Grove, Mississippi, and during the Class Period, she was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

32.     Plaintiff Johnson has held numerous positions at Tyson Foods locations in Carthage and Forest, Mississippi, including Wing Rounder, Grader, Billing Clerk, and Accounting Clerk, and has been employed by Tyson Foods from September 2008 through present.

33.     During the Class Period, Plaintiff Johnson invested in the Active Stable Value Fund. Plaintiff Johnson is still currently enrolled in the Plan.

34.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts through paying excessive Total RKA fees during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Northwest as its recordkeeper, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

35.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

36.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed).

37.     Having never managed a massive 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

38.     Tyson Foods is a multi-national, food company producing approximately 20% of the beef, pork and chicken in the United States, in addition to foods under the Tyson®, Jimmy Dean®, Hillshire Farm®, BallPark®, Wright®, Aidell's® and State Fair® brands. Tyson Foods' headquarters are located at 2200 W. Don Tyson Parkway, Springdale, AR 72762. In this Complaint, "Tyson Foods" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

39.     Tyson Foods acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Tyson Foods and its Board appointed other Plan fiduciaries to administer and manage the Plan and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Tyson Foods and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

40.     The Plan is administered by Defendants. As the Plan Administrator, Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Defendants have the authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

41.     In 2022, the Plan had $3,240,139,798 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than almost

any other 401(k) plans in the United States. Defendants, however, did not regularly monitor North-west to ensure that Northwest remained the prudent and objectively reasonable choices to provide Total RKA services, as illustrated by not reducing its Total RKA fees sufficiently.

42.    With 67,276 participants in 2022, the Plan had more participants than 99.98% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly, with $3,240,139,798 in assets in 2022, the Plan had more assets than 99.97% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## RECORDKEEPING AND ADMINISTRATION ("RKA") SERVICES AND FEES

43.    Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

44.    Defined contribution plan fiduciaries of 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled ser-vice offerings that can meet all the needs of massive retirement plans with a prudent and materially identical level and caliber of services. Northwest is one such recordkeeper.

45.    There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to defined contribution plans like the Tyson Foods Plan.

46.    All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar RKA services to maintain the same profit margin rate.

47.    There are three types of RKA services provided by all recordkeepers.

48.    The first type, "Bundled RKA," include:

a.    Recordkeeping;

b.    Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.    Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.    Maintenance of an employer stock fund;

f.    Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.    Plan consulting or investment management services including assistance in selecting the investments offered to participants;

h.    Accounting, audit, and legal services including the preparation of annual reports, e.g., Form 5500;

i.    Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.    Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules; and

k.    Trustee/custodian services.

49.    According to the Tyson Foods Plan Fee Disclosure Notice of June 30, 2023, "[p]lan administrative fees may include legal, audit, custodial, investment management, plan communications, participant investment guidance, recordkeeping, document retention, administrative personnel and other administrative fees."

50.     This is the same boilerplate language that Northwest uses for all its plans it record-keeps. There is nothing in the Fee Disclosure Notice provided to Plan participants to suggest that there is anything exceptional, unusual, or customized about the Bundled RKA services provided to Tyson Foods Plan participants by Northwest.

51.     The Plan provided participants all the commoditized and fungible Bundled RKA services provided to all other massive 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Northwest. Any differences in these Bundled RKA services are immaterial to the price quoted by recordkeepers for such services.

52.     Given the fungibility and commoditization of these Bundled RKA services for massive plans like the Tyson Foods Plan, failing to adjust fee arrangements, solicit bids, or negotiate for rebates with existing recordkeepers, all violate a fiduciary's duty of prudence under ERISA. *See Hughes II*, 63 F.4th at 625-626.

53.     According to the Tyson Foods Plan Fee Disclosure Notice of June 30, 2023, the Plan states that "[p]lan administrative expenses are charged monthly to [participants'] Plan account on a per capita basis based on expenses paid in that month. This means every participant in the plan is charged the same amount. The amounts charged to [participants'] account are based on the actual monthly expenses incurred by the plan for administrative fees. Based on the previous year's expenses [participants] could expect an annual fee of $36 to $53. Since the fees charged to participants are based on actual expenses this estimate can change."

54.     Based on Plan 5500 Forms between 2017 and 2022, Northwest in fact charged Plaintiffs and Class Members between $40 and $46 annually per year deducted quarterly per participant for Total RKA.

55.     Since well before 2017, industry experts have maintained that for massive retirement plans like the Tyson Foods Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price.

56.     "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

57.     Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for massive plans like the Tyson Foods Plan.

58.     RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers, similar to Northwest, who can provide comparable Bundled RKA services for less if only asked to provide bids to plans like the Tyson Foods Plan.

59.     Given the mammoth size of the Tyson Foods Plan, the same price paid by the Tyson Foods Plan for Bundled RKA over the Class Period, and the trend of price compression for Bundled RKA over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, breaching their fiduciary duties of prudence.

60.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

        a.      Loan processing;

      b.      Brokerage services/account maintenance;

      c.      Distribution services; and

      d.      Processing of Qualified Domestic Relations Orders (QDROs).

61.    According to the Tyson Foods Plan Fee Disclosure Notice of June 30, 2023, the Plan only provided for a Participant Loan Origination Processing fee of $35 for each occurrence.

62.    The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

63.    According to the Tyson Foods Plan Fee Disclosure Notice of June 30, 2023, either no such fees were paid by the Plan or were improperly not disclosed.

64.    The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

65.    Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged for Total RKA services.

66.    The methodology utilized in this Complaint for calculating the Total RKA for both the Tyson Foods Plan and for all the comparison plans discussed below contains the following seven steps:

      a.   taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

      b.   reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

      c.   reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d. Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e. utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f. reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g. reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts experience in evaluating plans at the different recordkeepers.

67. Because the Total RKA offerings are fungible among all recordkeepers who provide services to massive plans, like the Tyson Foods plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Total RKA services.

68. This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

69. Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the Total RKA services that it provides to other massive plans are commodified, including the plan services provided to its own employees.

70.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the record-keeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable record-keeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

71.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

72.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

73.     According the Plan 5500 Forms, the Tyson Foods Plan paid both direct and indirect RKA fees during the Class Period to Northwest and other Plan service providers.

74.     With regard to the comparison plans to the Tyson Foods Plan, either they paid both indirect and direct compensation or only direction compensation for RKA services, as described below.

**ERISA Fiduciary Standards For Selecting and Monitoring Recordkeepers**

75.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive

bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e,g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

76.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Total RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

77.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

78.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary. Plan fiduciaries treat RKA services as a commodity or fungible when negotiating RKA fees.

79.    An internal benchmarking survey from CapTrust, Fiduciary Decisions/Benchmarks, or similar company, is inadequate to determine a reasonable Total RKA fee. Such benchmarking surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" Total RKA fee in the prevailing market, investment consultants routinely advise plan fiduciaries to engage in solicitations of competitive RKA bids on a periodic basis of every three to five years.

80.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

81.    First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

82.    Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

83.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

84.    Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626.

## THE PLAN PAID UNREASONABLE TOTAL RKA FEES
## TO NORTHWEST DURING THE CLASS PERIOD

85.    A plan fiduciary must continuously monitor its Total RKA fees by regularly conduct-ing an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees become unreasonable. *See Hughes*, 142 S. Ct. at 742.

86.    During the Class Period, Defendants egregiously failed to monitor the Plan's Total RK&A fees paid to Northwest.

87.    During the Class Period, Defendants failed to regularly solicit quotes and/or compet-itive bids from recordkeepers, including but not limited to Northwest, in order to avoid paying unrea-sonable Total RKA fees.

88.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants fol-lowed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to Northwest and in light of the level and quality of Total RKA services it received that were materially similar to services available through other recordkeepers and provided to other massive plans.

89.    As set forth in the table below, from the years 2017 through 2022, based upon infor-mation provided in 5500 Forms filed with the DOL and provided by the Plan fiduciaries to Plan participants in the Required Fee Disclosure, the Plan paid an effective average annual Total RKA fee of $42 per participant.

### Total Recordkeeping and Administration (Total RKA) Fees

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|---|
| **Participants** | 57,407 | 63,593 | 65,298 | 68,002 | 67,362 | 67,276 | *64,823* |
| **Est. Total RKA Fees** | $2,632,562 | $2,605,860 | $2,658,642 | $2,727,293 | $2,920,300 | $2,817,146 | *$2,726,967* |
| **Est. Total RKA Per Participant** | $46 | $41 | $41 | $40 | $43 | $42 | *$42* |
| **Reliable Est. of Reasonable Total RKA Fees** | $1,377,768 | $1,526,232 | $1,567,152 | $1,632,048 | $1,616,688 | $1,614,624 | *$1,555,752* |
| **Reliable Est. of Reasonable Total RKA Fees Per PP** | $24 | $24 | $24 | $24 | $24 | $24 | *$24* |
| **Est. Total RKA Losses** | $1,254,794 | $1,079,628 | $1,091,490 | $1,095,245 | $1,303,612 | $1,202,522 | *$1,171,215* |
| **Est. Total RKA Losses Per PP** | $22 | $17 | $17 | $16 | $19 | $18 | *$18* |

90.    The table below illustrates the annual Total RKA fees paid by other comparable plans of similar size, receiving a materially similar level and quality of Total RKA services in 2018.

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available)

| Plan | Partici-pants | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|---|
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | $988,267 | $28 | Fidelity |
| The Dow Chemical Company Employees' Savings Plan | 40,596 | $10,766,545,647 | $1,322,048 | $33 | Fidelity |
| Procter & Gamble Profit Sharing Trust & Employee Stock Ownership Plan | 53,048 | $17,464,554,014 | $1,680,893 | $32 | Alight |
| The Sherwin-Williams Company Employee Stock Purchase and Savings Plan | 53,925 | $6,459,314,872 | $1,599,455 | $30 | Fidelity |
| **Tyson Foods Plan 2018 Fee** | **63,593** | **$2,372,771,614** | **$2,605,860** | **$41** | **Northwest Plan Services, Inc.** |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,676,414 | $20 | Vanguard |
| Raytheon Savings and Investment Plan | 82,788 | $17,243,679,305 | $2,292,583 | $28 | Fidelity |

91.    To determine the Total RKA fees that other comparable plans are paying, Plaintiffs considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s.

92.    To ensure meaningful, apples-to-apples comparisons, Plaintiffs used the same methodology to compare the fees of the Plan with the fees of other similarly situated and comparable plans.

93.    **Danaher Corporation & Subsidiaries Savings Plan** ("Danaher"): The estimate of $28/pp (rounded) is comprised of $23.40/pp in direct compensation paid to Fidelity from Form 5500

Schedule C and a calculation of $4.23/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

94.    The Danaher Plan is a meaningful benchmark because in 2018 it had over 35,000 participants. The costs to a recordkeeper for providing services to a plan with more than around 5,000 participants are driven primarily by the number of participants.  There are no material differences in the services provided to plans as large as both the Danaher Plan and the Tyson Foods Plan and any service differentials cannot explain the disparity between the fees paid by the Danaher Plan and the fees paid by the Tyson Foods Plan.

95.    Therefore, all else being equal, if the Danaher Plan can obtain a fee of $28/pp with 35,757 participants, then the Plan, with 63,593 participants, should be able to obtain a fee of around $28/pp, *or lower*. The fact that the Tyson Foods Plan has *more* participants than the Danaher Plan does not make the Danaher Plan a meaningless comparable plan because, if anything, all else being equal, the Plan should be able to obtain a fee equal to or lower than the Danaher Plan.

96.    **The Dow Chemical Company Employees' Savings Plan** ("Dow"): The reliable estimate of $33/pp is comprised of $33 in direct compensation paid to Fidelity from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Dow Plan appear to contain revenue sharing.

97.    The Dow Plan is a meaningful benchmark because in 2018 it had over 40,000 participants. The costs to a recordkeeper for providing services to a plan with more than around 5,000

participants are driven primarily by the number of participants. There are no material differences in the services provided to plans as large as both the Dow Plan and the Tyson Foods Plan and any service differentials cannot explain the disparity between the fees paid by the Dow Plan and the fees paid by the Tyson Foods Plan.

98.     Therefore, all else being equal, if the Dow Plan can obtain a fee of $33/pp with 40,596 participants, then the Plan, with 63,593 participants, should be able to obtain a fee of around $33/pp, *or lower.* The fact that the Tyson Foods Plan has *more* participants than the Dow Plan does not make it a meaningless comparable plan because, if anything, all else being equal, the Tyson Foods Plan should be able to obtain a fee equal to or lower than the Dow Plan.

99.     **Procter & Gamble Profit Sharing Trust & Employee Stock Ownership Plan** ("P&G"): The reliable estimate of $32/pp is comprised of $32 in direct compensation paid to Alight from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the P&G Plan appear to contain revenue sharing.

100.     The P&G Plan is a meaningful benchmark because in 2018 it had 53,048 participants, similar to the 63,593 participants in the Plan. The costs to a recordkeeper for providing services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the services provided to plans as large as both the P&G Plan and the Tyson Foods Plan and any service differentials cannot explain the disparity between the fees paid by the P&G Plan and the fees paid by the Tyson Foods Plan.

101.     Therefore, all else being equal, if the P&G Plan can obtain a fee of $32/pp with 53,048 participants, then the Plan, with 63,593 participants, should be able to obtain a fee of around $32/pp,

*or lower*. The fact that the Tyson Foods Plan has *more* participants than the P&G Plan does not make it a meaningless comparable plan because, if anything, all else being equal, the Tyson Foods Plan should be able to obtain a fee equal to or lower than the P&G Plan.

102. **The Sherwin-Williams Company Employee Stock Purchase and Savings Plan** ("Sherwin-Williams"): The reliable estimate of $30/pp is comprised of $30/pp in direct compensation paid to Fidelity from Form 5500 Schedule C and $0/pp in indirect compensation because the financial statement filed with the Plan's Form 5500 by the Plan's auditor indicates that indirect compensation earned by Fidelity in the form of revenue sharing is credited back to the plan and therefore results in no additional compensation to Fidelity.

103. The Sherwin-Williams Plan is a meaningful benchmark because in 2018 it had 53,925 participants, similar to the 63,593 participants in the Plan. The costs to a recordkeeper for providing services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the services provided to plans as large as both the Sherwin-Williams plan and the Tyson Foods Plan and any service differentials cannot explain the disparity between the fees paid by the Tyson Foods Plan and the fees paid by the Sherwin-Williams Plan.

104. Therefore, all else being equal, if the Sherwin-Williams plan can obtain a fee of $30/pp with 53,925 participants, then the Plan, with 63,593 participants, should be able to obtain a fee of around $30/pp, *or lower*. The fact that the Tyson Foods Plan has *more* participants than the Sherwin-Williams Plan does not make it a meaningless comparable plan because, if anything, all else being equal, the Tyson Foods Plan should be able to obtain a fee equal to or lower than the Sherwin-Williams Plan.

105. **Google LLC 401(K) Savings Plan** ("Google"): The reliable estimate of $20/pp (rounded) is comprised of $17.34/pp in direct compensation paid to Vanguard from Form 5500

Schedule C and a calculation of $2.92/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

106.    The Google Plan is a meaningful benchmark because in 2018 it had over 82,725 participants, which is more participants than the Tyson Foods Plan and therefore, provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services recordkeeping fees across a range of participants and which declines as a plan gains more participants. The costs to a recordkeeper for providing services to a plan with more than around 5,000 participants are driven primarily by the number of participants.

107.    The fact that the Tyson Foods Plan has *fewer* participants than the Google Plan does not make the Google Plan a meaningless comparable plan. The Google Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of participants.

108.    **Raytheon Savings and Investment Plan** ("Raytheon"): The reliable estimate of $28/pp is comprised of $28 in direct compensation paid to Fidelity from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Raytheon Plan appear to contain revenue sharing.

109.    The Raytheon Plan is a meaningful benchmark because in 2018 it had over 82,788 participants, which is more participants than the Tyson Foods Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services recordkeeping fees across a range of participants and which declines as

a plan gains more participants. The costs to a recordkeeper for providing services to a plan with more than around 5,000 participants are driven primarily by the number of participants.

110.    The fact that the Tyson Foods Plan has *fewer* participants than the Raytheon Plan does not make the Raytheon Plan a meaningless comparable plan. The Raytheon Plan, along with the Google Plan, provides data points that enable the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of participants.

111.    The following table is a summary of the relevant calculations for the comparable plans, all of which receive materially similar and fungible Total RKA services to the Tyson Foods Plan.

| | Danaher | Dow Chemical | Procter & Gamble | Sherwin Williams | Google | Raytheon |
|---|---|---|---|---|---|---|
| | Fidelity | Fidelity | Alight | Fidelity | Vanguard | Fidelity |
| Participants (#) | 35,757 | 40,596 | 53,048 | 53,925 | 82,725 | 82,788 |
| Assets ($) | $4,565,702,706 | $10,766,545,647 | $17,464,554,014 | $6,459,314,872 | $11,786,824,293 | $17,243,679,305 |
| Direct Compensation (Schedule C) ($) | $836,861 | $1,322,048 | $1,680,893 | $1,599,455 | $1,434,851 | $2,292,583 |
| Indirect Compensation (Rev Share) ($) | $151,406 | $0 | $0 | $0 | $241,563 | $0 |
| Administrative Credit to Plan ($) | $0 | $0 | $0 | $0 | $0 | $0 |
| **Annual RK&A Fees ($)** | **$988,267** | **$1,322,048** | **$1,680,893** | **$1,599,455** | **$1,676,414** | **$2,292,583** |
| Annual RK&A Fees ($/pp) | $28 | $33 | $32 | $30 | $20 | $28 |

112.    Viewing all the data points provided by the comparable plan set forth above holistically and in the full context of how the retirement plan industry operates, provides sufficient evidence to support a plausible inference that the Plan paid unreasonable and excessive fees for Total RKA services.

113.    The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provide throughout the Class period for other plans with a similar number of participants as the Plan.

114.    Recordkeepers are able to negotiate at arm's length with plan fiduciaries and accept higher fees from plan fiduciaries that are unaware of the reasonable market rate through, for example, failing to solicit competitive and/or proprietary bids, among other things.

115.     Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 5,000 is the imprudent fiduciary processes followed by plans' fiduciaries.

116.     The most plausible explanation of the disparity of between $8/pp and $21/pp from the comparable plans and the Tyson Foods Plan (an excess of between 26% and 102%) in 2018 is that the Plan's fiduciaries engaged in imprudent conduct.

117.     The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is $5 per participant or less and is most plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

118.     This smaller disparity is in stark contrast to the disparity of $14 per participant paid by the plan compared to the reliable estimate of a reasonable fee rate for a plan with 63,593 participants of around $27 in 2018.

119.     The amount of assets in a plan has little to no impact on the costs to the recordkeeper so any differences in the amount of assets in the comparable plans compared to the Tyson Foods Plan has no impact on whether the comparable plans make meaningful benchmarks.

120.     The comparator plans serviced by other recordkeepers and who charged less received materially the same level and quality of Total RKA services given that these services are fungible and commodified for massive Plan like the Tyson Foods Plan.

121.     Each of these comparator plans note in their fee disclosures and other Plan documents that they received Total RKA services materially similar to the Tyson Foods Plan in the form of recordkeeping, trustee, accounting, and other administrative fees.

122.    Although some of the comparator utilize different service or compensation codes for the services received on the 5500 Form, the fact remains the Total RKA fees are fungible and commoditized and any differences between the plans in these codes are immaterial from a pricing perspective.

123.    The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2018, compared to the 2018 Total RKA fees paid by the Tyson Foods Plan, with the white data points representing Total RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



124.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including Northwest itself, serving the market for similarly-sized plans would be willing to accept in a competitive environment to provide Total RKA services to the Tyson Foods Plan.

125.    The table and graph above illustrate that the Plan paid a Total RKA fee of $41 per participant for 2018.

126.    A reasonable Total RKA fee for 2018 for the Tyson Foods Plan based on the services provided by existing recordkeepers and the Plan's commodified and fungible services based on graph and charts above would have been $27 per participant.

127.    The Total RKA fees paid by the Plan to Northwest during the Class Period were excessive relative to the RKA services rendered given the commoditized and fungible nature of RKA fees for massive plans like the Tyson Foods Plan.

128.    More specifically, from 2017 to 2022, an unreasonable disparity of $18 per participant (over 75% premium) existed.

129.    From the years 2017 through 2022 and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $2,726,967 per year in Total RKA fees, which equated to an effective average of approximately $42 per participant per year.

130.    A hypothetical prudent plan fiduciary would not agree to pay *a 75% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

131.    From the years 2017 through 2022, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $1,171,215 per year in additional Total RKA fees, which equates to on average approximately $18 per participant per year.

132.    From the years 2017 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $7,027,291 in unreasonable and excessive Total RK&A fees.

133.    From the years 2017 to 2022, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $9,365,188 in Total RKA fees.

134.    Defendants failed to take advantage of the Plan's mammoth size to timely negotiate lower fees from its existing recordkeeper, Northwest.

135.    Defendants could have obtained materially similar Total RKA services for much less from other recordkeepers or from Northwest itself had it only leveraged its massive size.

136.    It can be plausibly inferred from the unreasonably high fees it paid for Total RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for Total RKA services, and failed to use the Plan's massive size to negotiate rebates from Northwest.

137.    Plaintiffs and Class Members paid all of these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

138.    Defendants should have removed Northwest as Plan recordkeeper during the Class Period. Instead, it kept Northwest at these inflated Total RKA fee prices for over fifteen years at least.

139.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions including removing Northwest as the Plan recordkeeper, Defendants breached its fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

140.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

141.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Tyson Foods, Inc. Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning November 30, 2017, and running through the date of judgment.

142.    The Class includes approximately 67,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

143.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties of prudence and loyalty to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

144.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

145.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

146.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

147.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

148.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

149.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

150.    The claims asserted on behalf of the Tyson Food Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

151.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

152.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence Under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendants – Total RKA Fees)**

153.    Plaintiffs restate the above allegations as if fully set forth herein.

154.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

155.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in its administration of the Plan.

156.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable Total RKA fees.

157.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

158.     During the Class Period, Defendants breached its fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's Total RKA fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

159.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Northwest, to make sure it was providing the Total RKA services at reasonable cost, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Northwest if it provided RKA services at objectively unreasonable fee levels.

160.     During the Class Period, Defendants breached their duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

161.     Defendants failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

162.     As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

163.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Tyson Foods Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other
Fiduciaries under ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against
Defendants – Total RKA Fees)**

164.    Plaintiffs restate the above allegations as if fully set forth herein.

165.    Defendants had the authority to appoint and remove members or individuals responsible for Plan Total RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

166.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan Total RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

167.    Defendants had a duty to ensure that the individuals responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendants.

168.    The unreasonable Total RKA fees paid by the Plan inferentially establish that Defendants breached their duty to monitor by, among other things:

      a.    Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable Total RKA expenses;

      b.    Failing to monitor the process by which the Plan's recordkeeper, Northwest, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

      c.    Failing to remove individuals responsible for Plan Total RKA fees whose performance was inadequate in that these individuals continued

to pay the same Total RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining Northwest as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

169.    As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

170.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Tyson Foods Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Total RKA fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Tyson Foods to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Tyson Foods as necessary to effectuate relief, and to prevent Tyson Foods's unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: November 30, 2023                    **CARNEY BATES & PULLIAM, PLLC**

*/s/ Randall K. Pulliam*
Randall K. Pulliam
519 W. 7th Street
Little Rock, AR 72201
Telephone: 501-312-8500
E-Mail: rpulliam@cbplaw.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda*
*Pro Hac Vice Motion Pending*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Fax: (262) 565-6469
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*