IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RANDALL W. RUEBEL;
MARIO HUDSON; and
TAMMY L. JOHNSON,
Individually, and as Beneficiaries of the
Tyson Foods, Inc. Retirement Savings Plan                              PLAINTIFFS

V.                                    CASE NO. 5:23-CV-5216

TYSON FOODS, INC. and
BOARD OF DIRECTORS OF TYSON FOODS, INC.                              DEFENDANTS

### MEMORANDUM OPINION AND ORDER

Now before the Court is a Motion to Dismiss (Doc. 40) filed by Defendants Tyson Foods, Inc. and the Board of Directors of Tyson Foods, Inc. (collectively, "Tyson").[1] On July 8, 2024, the Court held an in-person hearing during which counsel for both sides presented oral argument on the Motion. At the close of the hearing, the Court took the Motion under advisement and stayed discovery pending a written ruling. For the reasons explained herein, the Motion is **GRANTED**.

## I. BACKGROUND

The Amended Complaint (Doc. 34) explains that Tyson sponsors for the benefit of its employees a 401(k) defined-contribution plan known as the Tyson Foods, Inc. Retirement Savings Plan ("Plan"). The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), and Tyson exercises discretionary authority as plan "fiduciary" as that term is defined at 29 U.S.C. § 1002(21)(A) of the ERISA statute. Tyson's

---

[1] In ruling on the Motion, the Court also considered Tyson's Brief in Support (Doc. 41), Plaintiffs' Response in Opposition (Doc. 46), and Tyson's Reply (Doc. 48).

employees qualify as plan "participants" as that term is defined at § 1002(7). And, according to § 1104(a)(1)(B), a fiduciary like Tyson must discharge its duties to the Plan and its participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

In a defined-contribution plan like Tyson's, "[t]he amount available at retirement depends on the choices that participants make: when and how much to contribute, what investments to select, and when to start withdrawing the money." *Matousek v. MidAm. Energy Co.*, 51 F. 4th 274, 277 (8th Cir. 2022). A plan's performance therefore "depend[s] on how well the plan managers carry out their fiduciary duties, including their diligence in keeping costs low . . . ." *Id.* One such cost is the subject of Plaintiffs' lawsuit: They complain that the amount the Plan charges to its participants for account management, auditing, and other basic recordkeeping tasks—called "Bundled RKA fees," for short—is unreasonably high when compared to the fees that similar retirement plans charge their participants for the same basic services. Bundled RKA fees are deducted from Plan participants' accounts at the end of each calendar year. Plaintiffs seek to recoup in damages the tens of millions of dollars of fees they claim they overpaid to the Plan's recordkeeper over a period of years.

In Count One of the Amended Complaint, Plaintiffs allege that Tyson violated its fiduciary duty of prudence by permitting the Plan to pay exorbitant Bundled RKA fees to Northwest Plan Services ("Northwest"), the Plan's recordkeeper since 2009. According to Plaintiffs, Tyson failed to critically evaluate the amounts that Northwest was charging

2

Plaintiffs and other Plan participants in Bundled RKA fees, in violation of Tyson's obligations under ERISA. Plaintiffs contend that Bundled RKA services "are essentially fungible and the market for them is highly competitive." (Doc. 34, ¶ 58). Further, they claim that there are "equally capable recordkeepers, similar to Northwest, who can provide comparable Bundled RKA services for less." *Id.*

Plaintiffs maintain that the key to driving down the costs for basic recordkeeping services is to solicit competitive bids from other recordkeepers. *Id.* They assert that by "leverag[ing] [Tyson's] massive size," Tyson could have "negotiate[d] rebates from Northwest" and lowered the cost of fees that way. *Id.* at ¶¶ 145–46. According to Plaintiffs, there has been a definite "trend of price compression for Bundled RKA [services] over the last six years." *Id.* at ¶ 59. And as a result, "it is possible to infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, [thus] breaching their fiduciary duties of prudence." *Id.*

In Count Two of the Amended Complaint, Plaintiffs allege that Tyson failed to adequately monitor Northwest to make sure that the cost it was charging for Bundled RKA fees was reasonable. By failing to take effective remedial action—including by removing Northwest as the Plan recordkeeper through a competitive bid process—Tyson permitted Plan participants to "be[ ] charged much higher Bundled RKA fees than they should have been." *Id.* at ¶ 148.[2]

Tyson's Motion to Dismiss argues that the Amended Complaint fails to meet the

---

[2] Plaintiffs admit that Count Two is derivative of the claim in Count One, which means that if Plaintiffs fail to state a claim under Count One, Count Two must also be dismissed.

3

Eighth Circuit's specific pleading standard for stating plausible ERISA claims for excessive recordkeeping fees. This standard appears in *Matousek v. Mid-American Energy Company*, a 2022 case in which the Court of Appeals held that to survive a motion to dismiss for failure to state a claim, plaintiffs must "identify similar plans offering the same services for less." 51 F.4th at 279 (citing *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579–80 (7th Cir. 2022)). A district court "cannot infer [a plan fiduciary's] imprudence unless similarly sized plans spend less on the same services." *Id.* at 279. Therefore, "[t]he key to nudging an inference of imprudence from possible to plausible is providing a sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high or returns are too low." *Id.* at 278 (internal quotation and citation omitted).

In its Motion to Dismiss, Tyson argues that the comparator plans listed in the Amended Complaint are not similar to Tyson's—both in terms of Bundled RKA services and plan size. With respect to the former, Tyson maintains that Plaintiffs are well aware that Northwest's recordkeeping fees include more services than those provided by the other plans' recordkeepers—as the Amended Complaint seems to concede. *See* Doc. 34, ¶¶ 49 & 50. Tyson claims that the fees that a recordkeeper charges are dependent, at least in part, on the plan's asset size. Of the five comparator plans cited by Plaintiffs, four of them have more than double Tyson's assets and the fifth plan has less than half of Tyson's assets. In view of these disparities, Tyson argues that the Court cannot meaningfully compare the Bundled RKA fees charged by Tyson and the comparator plans, and that, without "apples to apples" comparators, Plaintiffs' claim that Tyson's fees were too high compared to other similar plans is implausible.

4

Plaintiffs respond that all their comparators are so-called "mega plans," in that they comprise the top 100 largest plans regulated by ERISA. They ask the Court to find that all mega plans are similar enough to one another—in terms of services provided and assets controlled—to serve as useful comparators. Though Plaintiffs have conceded that the comparator plans contain billions of dollars more (or less) than Tyson's Plan, they maintain that asset size does not influence the rate a recordkeeper charges for Bundled RKA services. Plaintiffs insist instead that the number of participants in a plan drives the cost of recordkeeping fees, and here, the comparator plans are very similar to Tyson's in terms of numbers of participants.

## II. LEGAL STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678)). In ruling, the Court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quotation marks omitted). However, when considering such a motion, "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The only exceptions to the rule

involve "materials that are part of the public record or do not contradict the complaint" and documents "necessarily embraced by the pleadings." *Id.* (quotations and citations omitted).

When a case involves ERISA fiduciary claims, the level of scrutiny applied to the alleged facts is higher than in other types of cases.

> In putative ERISA class actions, Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Courts apply a "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the plausible sheep from the meritless goats." *Dudenhoeffer*, 573 U.S. at 425. Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, [ ] courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes* [*v. Northwestern University*], 142 S. Ct. [737,] 742 [(2022)].

*Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (internal citations cleaned up). As a result, plaintiffs asserting ERISA recordkeeping-fee claims cannot "clear[ ] the pleading bar [except] by alleging enough facts to '*infer* . . . that the process was flawed.'" *Matousek*, 51 F.4th at 278 (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (emphasis in original)). Such an inference is only plausible if the plaintiffs can point to "similarly sized plans [that] spend less on the same services." *Id.* at 279 (citing *Albert*, 47 F.4th at 579–80).

## III. DISCUSSION

### A. Tyson's and the Comparator Plans Do Not Plausibly Offer the Same Services.

The Amended Complaint explains that "[t]here are three types of RKA services provided by all recordkeepers," (Doc. 34, ¶ 48): (1) "Bundled RKA," which "may include" any combination of nine basic services, *id.* at ¶ 49; (2) "A La Carte" services, *id.* at ¶ 60;

and (3) "Ad Hoc" services, *id.* at ¶ 62. Only the "Bundled RKA" fees are in dispute in this case. Plaintiffs contend that "the best methodology for determining apples-to-apples comparisons of plans" is to compare the amounts that each recordkeeper charges for Bundled RKA services because they are "fungible and commoditized among all recordkeepers." *Id.* at ¶¶ 65 & 66.

Importantly, however, Plaintiffs admit that Tyson's recordkeeper, Northwest, may provide *extra* Bundled RKA services to Tyson's Plan that are not included in the standard and fungible services that all recordkeepers provide. According to a "Plan Fee Disclosure Notice" dated June 30, 2022, Tyson informed all Plan participants that Northwest "may also" provide "legal, audit, . . . investment management, . . . [and] participant investment guidance" in addition to basic Bundled RKA services. *Id.* at ¶ 50.

Plaintiffs' admission that the comparator plans were charged certain fees for basic Bundled RKA services, but Tyson may have been charged *higher* fees for *extra* services means that Plaintiffs have failed to state a plausible recordkeeping-fee claim. According to *Matousek*, courts "cannot infer imprudence unless similarly sized plans spend less *on the same services*." 51 F.4th at 279 (emphasis added). If it appears in "plain English" from the face of the pleading that "per-participant fees cover more than just standard recordkeeping services," the comparator plans must also cover those same extra services, or they will not present "sound" and "meaningful" benchmarks. *Id.* The Court finds that Plaintiffs have failed to allege a plausible inference that Tyson's Plan and the comparator plans charged different fees for the same Bundled RKA services. Therefore, the breach of fiduciary duty claims are subject to dismissal.

7

### B. Tyson's and the Comparators' Plans Are Not Similarly Sized.

A second, independent reason why Plaintiffs' case must be dismissed is because the comparator plans are not similar enough to Tyson's in terms of asset size to allow for meaningful comparisons. Though the Eighth Circuit has not drilled down on the definition of "similarly sized," Plaintiffs contend that a plan can be "similar" to another if the number of plan participants is roughly the same, regardless of the amount of assets each plan controls.[3]  The Court disagrees that Plaintiffs' definition of "similar" plans is in line with the Eighth Circuit's.

In *Matousek* the Court of Appeals clearly considered asset size when determining whether comparator plans presented "*meaningful* benchmark[s]." *Id.* at 280 (emphasis in original). Comparator plans that contained "under a quarter of the total assets" of the defendant's plan were excluded from consideration. *Id.* What's more, the Amended Complaint itself acknowledges the importance of asset size in the bidding process for Bundled RKA fees. *See* Doc. 34, ¶ 40 (quoting from Department of Labor guidance for plan fiduciaries, which advises them to provide recordkeepers with "the number of plan participants *and the amount of plan assets* as of a specified date" to generate a competitive bid (emphasis added)).

---

[3] In fact, counsel for Plaintiffs argued during the motion hearing that when it comes to recordkeeping fees, "the only thing that matters when you bid these things out is participants. It doesn't matter whether you are a billion in assets, 500 million in assets, 5 billion in assets . . . . Assets are irrelevant for most purposes."

In the instant case, the asset sizes of the five comparator plans are not remotely similar to Tyson's. Plaintiffs agree that the following chart contains accurate asset information for Tyson's Plan and the comparators' plans:[4]

| Plan | Plan Assets (Billions) | $ Difference from Tyson Plan (Billions) | % Difference |
|---|---|---|---|
| Tyson Plan | $3.7 | N/A | N/A |
| Leidos Plan | $10.0 | $6.3 | 270% |
| General Dynamics Plan | $9.9 | $6.2 | 267% |
| Aldi Plan | $1.6 | -$2.1 | 43% |
| Fidelity Plan | $24.3 | $20.6 | 657% |
| Deloitte Plan | $9.9 | $6.3 | 267% |

According to the above data, the comparator plans sponsored by Leidos, General Dynamics, and Deloitte are nearly three times larger than Tyson's in terms of asset size; the plan sponsored by Fidelity is nearly seven times larger than Tyson's; and the plan sponsored by Aldi is less than half of Tyson's size. Though Plaintiffs contend that these differences do not matter, the Eighth Circuit plainly disagrees. *See Matousek*, 51 F.4th at 280.

Plaintiffs argue that any of the 100 largest defined-benefit plans would be "similar" to Tyson's Plan per *Matousek*'s standards. To support this contention, they cite

---

[4] Tyson prepared this chart, which appears in its Brief in Support of the Motion to Dismiss, *see* Doc. 41, p. 9, with data drawn from each plan's Form 5500, as cited in Paragraph 87 n.1 of the Amended Complaint. Every ERISA plan must file with the Department of Labor a Form 5500 to satisfy annual statutory reporting requirements. The Eighth Circuit has held that the contents of Forms 5500 may be considered when evaluating a motion to dismiss a complaint alleging ERISA recordkeeping-fee claims. *See Matousek*, 51 F.4th at 279.

to the District of Minnesota's recent opinion in *Dionicio v. U.S. Bancorp*, an ERISA recordkeeping-fee case that survived a motion to dismiss for failure to state a claim. 2024 WL 1216519, at *1, *31 (D. Minn. Mar. 21, 2024). In Plaintiffs' retelling, the District of Minnesota held that *any* mega plan with over $500 million in assets and at least 46,000 participants would serve as a fair comparator to any other mega plan. Therefore, Plaintiffs believe that the mega plans they have cited in the Amended Complaint are "relatively close matches given the [Tyson] Plan's exceptional size." (Doc. 46, p. 14).

The problem with Plaintiffs' argument is that *Dionicio* did not issue a sweeping holding as to *all* mega plans. Instead, the *Dionicio* court ruled that "*under the circumstances of this case*," the mega plans identified by the plaintiffs presented "a 'like-for-like comparison' that provide[d] a 'meaningful benchmark' for assessing the Plan's recordkeeping fees." 2024 WL 1216519, at *3 (emphasis added) (quoting *Matousek*, 51 F.4th at 279). The *Dionicio* plaintiffs offered the court seven comparator plans, three of which were very close in asset size to the defendant's plan, which was valued at approximately $10 billion. *See Dionicio v. U.S. Bancorp*, Case No. 0:23-CV-00026-PJS-DLM (D. Minn. May 2, 2023) (Doc. 34, p. 15). The three similar plans—sponsored by Leidos, General Dynamics, and Deloitte—contained assets ranging from $9,863,978,096 to $10,028,148,473. *Id.* In denying the defendant's motion to dismiss, the *Dionicio* court observed that these three comparator plans had "a difference in assets of less than 1%," as compared to the defendant's plan. 2024 WL 1216519, at *3. It appears the court entirely ignored the four other comparator plans, likely because they did not have "a difference in assets of less than 1%"—and because having three good comparators was

10

sufficient to state a plausible claim. *Id.*; *see also Dionicio v. U.S. Bancorp*, Case No. 0:23-CV-00026-PJS-DLM (D. Minn. May 2, 2023) (Doc. 34, p. 15).

The facts in the case at bar are not the same as those in *Dionicio*. Though Plaintiffs here have cited to many of the same comparator plans that were before the *Dionicio* court, Tyson's Plan has significantly fewer assets than the plan at issue in *Dionicio*. As a result, the same comparators range from half the size to seven times larger than Tyson's plan— nowhere near the 1% difference the *Dionicio* court observed.[5] Therefore, none of Plaintiffs' comparators' plans are similar enough to Tyson's to provide meaningful benchmarks, and Plaintiffs' recordkeeping claims fail to meet *Matousek*'s specific pleading standard.

## IV. CONCLUSION

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 40) is **GRANTED** for the reasons explained above, and the case is **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6) for failure to state a claim.

**IT IS SO ORDERED** on this 6th day of August, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[5] The Court does not consider here whether the comparator plans are "similar" in terms of plan participants. However, for reference, in 2021, Tyson had 67,362 participants, Fidelity had 64,113 participants, and Aldi had 56,577 participants; Leidos had 46,995 participants, and General Dynamics had 48,852 participants; and Deloitte had 98,051 participants. *See* Doc. 34, ¶ 87.